Army Skalmowski for Petitioners Jez Ron and Junata Marpaung, father and son. First of all, the IJA found petitioners to be credible in this case. This court has consistently held that death threats alone can constitute persecution. Threats may be compelling evidence of past persecution when they are specific, menacing, and accompanied by evidence of violent confrontation, near confrontation, and vandalism. In this case, in 1994, Mr. Jez Ron Marpaung, the father, was dating his then-Muslim girlfriend. At the time, he was at home with his son. A group of armed, angry Muslims came to his home, threatening him with death because they objected to him dating this Muslim woman. Counsel, with respect, aren't you forgetting a prong of this? Let's just take for a moment the accuracy of what you've said. Under Reyes-Reyes, the government either has to be involved in this to meet the test, or the government has to fail to control a pattern of these kinds of things. If the government knew of and supported or didn't do anything to stop this, that's one thing. But where's the evidence of the second prong of Reyes-Reyes in this case? Well, what happens is, after this episode ends, he goes to the village chief, the village head, who appears to be the government authority in this area. He basically reports this incident to the village head. The village head tells him, do not report this to the police. If you do, it will make things worse. For right now, you might be saved, but I suggest that you leave town immediately. But this gentleman is a physician. The government's aware of his religious background. He's hired by them. With all respect, I'd love you to be able to point me to some evidence in the record that shows that the government is involved in it. There's no question that there are occasionally incidents of religious animosity, individualized attacks. It's deplorable, though they are, it doesn't seem to meet Reyes-Reyes. Am I missing something? Well, I believe in this case, what makes this case unique, it's not just a Christian case. The evidence is loaded with discussion as to the Christian problems in Indonesia. Here we have a mixed marriage type situation, even prior to mixed dating, mixed marriage. But doesn't that happen throughout the world? I mean, there are some religious groups, and Islam is well known for this as well. When someone dates, wants to marry someone outside the faith, it can be a horrific thing. But that can be true in Catholic countries, it can be true in, you know, if you're a Dutch Reformed and you're in Pella, Iowa, your parents are going to be really upset if you're going to marry somebody that's outside the faith. Again, unfortunate, sad, sometimes violent. But here we're talking about having someone come into the United States we have to judge based upon the law. And the law says that not only do you have these individual instances, deplorable though they may be, but you must tie them to the government's either direct involvement or the government's failing to take action to stop them if they're aware of them. And I think it was this case, if I'm not mistaken, it may have been a different case where the police actually did, that's a different case, I guess, where they surrounded the residents and protected these folks. But can you help me with any evidence about government involvement other than what you just mentioned about the police chief? Well, I think, well, there's also the second incident involved the family itself. And like a private family can also persecute if the government fails, is unwilling or unable to interfere. Did the government know about this family persecution? Well, according to the testimony, the petitioner said that the police, that the family of the wife had contacted the police and that the police was basically on their side and they should definitely, you know, not further involve the police because they would not protect the non-Muslim family. So it seems like based on the testimony that the wife's family already had the police in their pocket. That's what I read from what the wife was testifying to. That's stretched, counsel. Well, I can go to the actual transcript, Your Honor. Mind you, this has to be substantial evidence under Reyes, Reyes. Well, before we go there, I wanted to come back briefly as to the issue you mentioned about it happened to a Dutch Catholic. Right. In the record, I believe it's page 811, it gets into the Islam apostasy and human rights. And it appears, according to this evidence, because they did credibly testify in the record, the petitioner said that, in Islam, that you have a right to kill someone if they are an apostate. They said that on their record. The government never challenged that. Okay. Let's say that's true. Let's say that's true. How does that tie in the government? Okay. So in the West, it appears that the apostate issue has vanished. However, in Islam, it has not. And... Again, let's say that's true. Okay. Assuming that's true... Who is the apostate here? The apostate was, is the wife. She's not a petitioner here. However, but they can kill the husband, too. That's what they testify to. He's also in danger of being killed. He mentioned a couple times in the record, he said that they will kill us. She was threatened by the telephonic threats as well as the written letters. The family threatened her and the family threatened him. Let me ask you, as you're running out of time, I want to ask you about the son's claim. What's the story with him? Did he suffer any past persecution? Well, we think based on the case that I submitted today, the Hernandez case, he was basically 11 years old when he came to the United States. So the answer is no, he doesn't get the benefit of the presumption based on past persecution. Well, I think he does, based on this case, because what he experienced, you know, the child's reaction would be to the injuries of his family is different than what we as adults would feel or would experience. In this case, the worst incident in 1994, when the mob was in front of the house, the son was in the house, too. He actually, they were both hiding in the house, and he saw these people with long swords screaming and yelling that they want to kill the father. So he actually witnessed this. I understood you in the brief to disclaim that you were showing past persecution. Page 19 of your brief. You know, I believe this case changes it, though. I think that if he were an adult, there wouldn't be past persecution. However, I think this case changes that. I think that what he experienced is, you know, at a young age, anywhere from 5 years old to 10 years old. He even talks about it. Counsel, that case was a 2007 case. Right. And you just gave it to us this morning. I apologize. I did not write these briefs for this case. We took over the case last month, and I apologize for that. I did assume that the other counsel had. Which case is it, by the way? I didn't see the 28th case. It's the Fernandez. Excuse me. Fernandez-Ortiz v. Gonzales 4964. Is that Judge Noonan's case? This is the Indian case. I was on that panel. Okay. And these are not anywhere close to being the same. That case involved a consistent pattern of government troops and rebels going through and destroying villages, you know, just en masse, you know, raping women, cutting open little kids, people having to run and hide for years and years and years. This is not that at all. It's not even close. Well, we've seen remands from the BIA where they do apply it this way, where it is a matter of what the age of the person was that experiences. Once again, this is a 7-, 8-year-old that's experiencing mobs with swords wanting to kill your parent. Looking out the window, seeing people wanting to storm and kill your family, I think that is, for that age of a person, child, I think that's a traumatic experience. It could be less if you're an adult, and I think that's where the case would fit in. You know, and also he did testify that he was in school. He was forced to recite Muslim prayers every day, even though the teachers and the kids knew he was not Muslim. Also, rocks were thrown at him every single day. I mean, if I have one day where rocks come hit me, I'd be afraid. Every day he experienced, or I said a lot, I experienced a lot. They knew he was Christian by what he wore in the private school, and the Muslim kids did this on a constant basis. So he experienced these things in a cumulative manner over the years. I think for his age, because he was eligible for asylum in this case, the judge defined that based on his minor status. But I think that's where the case would fit in. It would be different, you know, at his age versus, let's say, an adult. Your time is up. Thank you very much, sir. Good morning. Good morning. May it please the Court. Tom Dupree for the United States. The agency's determination in this case is supported by substantial evidence, and the petition for review should be denied. Let me begin with Judge Smith's line of questioning, which I think is exactly right. In this case, there clearly was substantial evidence supporting the agency's determination that even assuming arguendo, that the acts that the petitioner suffered amounted to persecution, there's no evidence of a governmental nexus. What the record reflects is that after these events occurred, the petitioner went to a man that he characterized, I think, as the village elder or the village head. But the petitioner is very careful to distinguish this village head from the police, both in the testimony and in his brief. He says, well, we didn't tell the police because we didn't think it would be useful or we thought they were in the pocket of our persecutors. And so I think that any argument now that reporting this incident to the village head is tantamount to reporting it to the police, I don't think, is square with the testimony that was given in this case. Of course, all this Court needs under its deferential standard of review is substantial evidence supporting the agency's determination, or in other words, whether the record compels the conclusion that he reported this to the Indonesian government and they did nothing. And I certainly don't think the record bears out that conclusion. I think also, even if somehow the petitioner were able to surmount the state action problem, it's clear that under this Court's precedence, he did not suffer past persecution. To be sure, the petitioner received some anonymous telephone calls. He received some anonymous letters. There was the incident where some individuals gathered outside his house and then they were dispersed by the neighbors. But I think under a number of this Court's holdings, most notably in Prasad, where even physical beatings don't necessarily constitute persecution, I think the petitioner falls far short of carrying his burden in this case. Certainly the record does not compel a contrary conclusion. I think his house is, if this were state action, you need to say that if his house were surrounded by an angry mob and they're threatening to kill him because he's a Christian, and again, getting overly, you know, stipulating that there's state action. That's not persecution. I don't think in the facts of this case, Judge Silverman, I grant you certainly one could imagine context in which, as the petitioner characterizes it, persons surrounding his house trying to break in armed, that could constitute persecution. But I don't think that's quite what happened in this case. What the petitioner testified was that it was a gathering of youths. I think one of them had a sword, he said. He said he brought along his sword and they were standing outside his house and then the neighbors came out and there was some back and forth, and the neighbors finally said, hey, look, will you go away and break it up, and the people went home, and that was the end of it. So, again, I don't think there's really a per se rule, and I certainly think even assuming state action, the IJ would have been well within her discretion in saying that here, it just simply didn't amount to persecution. Of course, the petitioner also argues that he was discriminated against at work, he was passed over for promotions and the like, but, of course, this Court's case law is crystal clear that mere discrimination or even harassment does not constitute persecution. Counsel, could you address the motion to remand? Absolutely, Judge Rawlinson. The Board addressed squarely the arguments that were set forth in the petitioner's motion to remand. As Your Honor knows, the petitioner sought a remand based upon this Court's panel decision in Lalonde. The Board squarely addressed in its decision why it deemed Lalonde, the panel decision, inapplicable. But where did the Board address and resolve the motion to remand? Well, I think in that footnote where it addressed Lalonde, I think the only thing that's missing from the Board's treatment of this issue is a statement saying the petitioner filed a motion to remand. What the Board said was it explained why, as a matter of law, Lalonde simply wasn't applicable in this case and why the Board did not want to extend the reasoning of Lalonde to this case. So doesn't our case law obligate the BIA to independently consider and address the motion to remand separate and apart from the underlying asylum withholding CAF applications? Well, I think with respect, I think it did do that, Your Honor. I think the Board did set out in a separate portion why it did not think Lalonde was applicable in this case. That was ---- What case authority do you have to support your position that referencing the case that the petitioner relies upon is sufficient to reflect independent consideration of a motion to remand? Well, I suppose I just was not aware of any case that would require the Board to do more in this context, Your Honor. My understanding ---- Suppose they should have done more. Yes. Let's just say for the sake of argument they should have done more. Sure. That case has now been vacated. That's right. So what would be the ---- what do we do about that? I mean, is there any point in sending it back? Well, if we grant that, then I think this Court still should deny the PFR simply on grounds of futility. Again, the petitioner's argument was to say remand so the immigration judge can consider the impact of the Lalonde panel decision. Of course, that Lalonde panel decision no longer exists. So I think it would be a real exercise in futility for this Court to send it all the way back, particularly given the duration of these proceedings, to consider a panel decision that is no longer the law and that's been vacated. I simply don't see the point. Let's assume for a moment that we agree with you about the futility issue. Is there any case law that addresses that point, i.e., that there is no obligation to remand to the BIA if it fails to consider a motion for reconsideration, if it would be futile for us to do so? Yes, I think so. There are a number of cases. I think it arises basically with the Chenery case, of course, which is a seminal Supreme Court decision concerning remands to agencies. And then it was also followed up in the NLRB v. Wyman Gordon, 394 U.S. 759. Say that again, NLRB v. what? Sure, v. Wyman Gordon. It's 394 U.S. 759. Is there an immigration case? Because we have, you know, Ventura that tells us we have to remand if it's an action that the agency has to take, and we cannot take the action for the agency. So do you have a case in the immigration context that says there's no need to remand if remand would be futile? I don't have one as I stand here today, Judge Rawlinson, but I will supply that to the court. I think it is certainly I know in other circuits, I believe in this circuit, too. I know for a fact in other circuits, the Second Circuit, for example, this issue often comes up. I'm not familiar with the case in our circuit that says there's no need to remand where remand would be futile. I think, you know, we take pretty seriously the direction in Ventura that if the BIA has failed to act, then we have to remand it for the BIA to say that it's futile. Well, I do think, though, that would contradict the cases, I agree, if they're not immigration cases. But again, in the larger context of administrative law and agency proceedings, I think the Supreme Court has said quite clearly that there is a futility exception. But immigration law is a law unto itself. Well, I won't quarrel with you there, Judge Rawlinson, but I think that the principle applies with full force. Again, I'm hard-pressed to see the wisdom, again, just as a prudential matter, the wisdom of sending this back to the agency so it can consider a now vacated circuit. Oh, it's to the Supreme Court. They gave us Ventura. Well, but I don't think Ventura necessarily applies to a case in which a remand would be futile. It's hard to see the logic of that. Again, it really would get into what the Supreme Court has described as a ping-pong game where this Court keeps sending it back simply so the board can say, well, this has been vacated, and therefore there's nothing more for us to do. Again, I do think it's fairly well settled just as a matter of general administrative law. I know other circuits have applied it in the context of immigration law, and I'll do my best to track down Ninth Circuit authority. But I would say even if this Court has not yet spoken to the issue, I do think just as a matter of prudential wisdom and good sense, there should be a futility exception in this context. If I could, in my remaining time, quickly speak to the issue of the Sons claim, I think Judge Silverman, I think it was Your Honor, that had correctly pointed out that the Petitioner has abandoned this claim. Your Honor had cited to the Petitioner's brief, it's page 19, where the Petitioner explains the various ways a Petitioner can seek asylum, namely through establishing past persecution or well-founded fear of future persecution, and then says explicitly, in this case, Junauda relies on fear of future persecution. So I think they clearly have waived any argument. They have not been making a past persecution argument. And for that reason, as well as the reasons identified by Judge Smith, namely that the Hernandez case is factually distinguishable, it wouldn't apply to this case in any event, because the Son is not basing the asylum claim on past persecution. It's based on the well-founded fear issue. Unless there are further questions from the panel, we'll ask that the petition for review be denied.  Thank you so much, Mr. Dupree. Dupree. Thank you. I don't know if you used up your time. If you want to take a minute and rebuttal, we'll do that. Let me ask you if you would address at the get-go, is there any point in remanding the motion to remand back to the BIA to consider a case that's no longer a case? It's been vacated, kicked off the books? Yeah, I don't think Lulong is dispositive for this case. I mean, that's my personal opinion. I think this is an individualized harm issue, not just a, you know, that's what Lulong dealt with. You know, this person had no individualized harm. I think this case, these people have fear of individualized harm. So what's your answer in terms of whether or not you would seek a remand to the BIA? I think at the time it was pertinent. I believe right now it's not. Okay. That's my personal opinion. Appreciate your candor on that. Briefly, just as a state action, the record talks about the government basically prohibiting members of one faith from converting members of other faiths. They do prohibit that. Also, the government tolerated the abuse of religious freedom by private groups or failed to punish persecutors and perpetrators. Unforced conversions between faiths occur as allowed by law, but they remain a source of controversy. The evidence also shows that she is an apostate, and what it talks about is that death is the option for these people to perform on her for doing this conversion. Also, it says Islamic countries with two exceptions do not address the issue of apostasy. Indonesia doesn't address it, but it does happen there to where they have a right to kill someone for this conversion, and that's what they're afraid of. They're afraid to go back because of that, and they did suffer because of that. Thank you very much, Mr. Petree. Thank you, too. This case was very well argued, and I thank you both for the cases submitted at this time. I think the petitioner is agreeing that it's going to be an important signing. Exactly. Thanks. United States v. Flores is submitted on the briefs, as is United States v. Delgado, which takes us to 0656380, Hoffman v. Construction Protective Services, Inc. Each side has 20 minutes on this case.
judges: Silverman, Rawlinson, Smith